# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|                              |   |                                                |
|------------------------------|---|------------------------------------------------|
| MILK STREET CAFE, INC.,      | ) |                                                |
|                              | ) |                                                |
| *Plaintiff*,                 | ) | Civil Action No. 16-11416-DJC                  |
|                              | ) | Judge Denise J. Casper                         |
| v.                           | ) | *(Leave to File Granted on July 21, 2016)*     |
|                              | ) |                                                |
| CPK MEDIA, LLC, d/b/a        | ) |                                                |
| MILK STREET KITCHEN,         | ) |                                                |
|                              | ) |                                                |
| *Defendant*.                 | ) |                                                |

# **REPLY IN SUPPORT OF PLAINTIFF'S**
# <u>**MOTION FOR PRELIMINARY INJUNCTION**</u>

Nowhere in its Opposition does CPK Media, LLC d/b/a Milk Street Kitchen ("Kimball") dispute that "Milk Street Kitchen" is confusingly similar to the MILK STREET CAFE Mark. Instead, Kimball's Opposition suggests that reconfiguring its logo to add the words "Christopher Kimball's" in small letters above the much larger, bold, all capitalized letters "Milk Street" in its logo and sometimes using the formal name "Christopher Kimball's Milk Street Kitchen" (while also continuing to use "Milk Street Kitchen" and "Milk Street") somehow resolves the issue. Kimball is wrong.  In this reverse confusion case, the addition of Christopher Kimball's name to "Milk Street Kitchen" or "Milk Street" will only aggravate the likelihood of confusion due to Kimball's renowned status as a celebrity and his ability to usurp complete control over and overwhelm the goodwill associated with Milk Street Cafe's brand.

Kimball's disingenuous suggestion that he has already agreed to using one of two "proposed names" beginning with "Christopher Kimball's" is misleading.  Kimball has made it quite clear that for his logo he would only use the words "Christopher Kimball's" in small font above the much larger "Milk Street" and that he would continue to sometimes use "Milk Street Kitchen" and "Milk Street" because, according to Kimball's counsel, "Christopher Kimball's Milk Street Kitchen" is a "mouthful."  Even if Kimball committed to exclusively using "Christopher Kimball's Milk Street Kitchen" or "Christopher Kimball's Milk Street" – which he does not—a likelihood of confusion still remains because, as Kimball admits, "Milk Street" is the predominant portion of the name.  It is the portion he does not want to change because "Milk Street permeates the entire company" and he believes "it is core to [his] mission."  (Kimball Decl. ¶ 43.)

Unfortunately for Kimball, Mr. Epstein had that same idea 35 years ago.  "Milk Street" has been the foundation of Milk Street Cafe's brand for the last 35 years and is the predominant

portion of its registered trademark—the same registered trademark Kimball does not dispute is valid, enforceable, and strong. Other than liking the name and apparently having committed to using it without first conducting a trademark clearance search, Kimball does not articulate why he needs the predominant focus of his brand to be "Milk Street" to successfully operate, especially considering his claim that his venture is "*not* open to the public" (Opp. at 15 (emphasis in original) and he is apparently still able to make changes to the logo and name. The harm to Milk Street Cafe is real, imminent, and incalculable.

I.   **KIMBALL DOES NOT DISPUTE CRUCIAL ISSUES SUPPORTING LIKELIHOOD OF CONFUSION**

For purposes of this preliminary injunction motion, Kimball does not dispute the following:

1. Milk Street Cafe is the owner of the valid MILK STREET CAFE Mark. (Opp. at 3). Consequently, there is no dispute that the MILK STREET CAFE Mark is distinctive.

2. "Milk Street Kitchen" and "Milk Street Cafe" are confusingly similar in sight, sound and appearance. As noted above, nowhere in Kimball's Opposition does it address the similarity between its use of "Milk Street Kitchen" and the MILK STREET CAFE Mark. *See* Section II, *infra.*

3. While Kimball mistakenly argues at length that its goods and services differ from Milk Street Cafe's when considered in the abstract, it does not dispute that consumers readily recognize that hosts of cooking shows also own restaurants. (Opp. at 10-13; Plevan Decl. Ex. 6). *See* Section III, *infra*.

4. Both Milk Street Cafe and Kimball communicate with their customers and potential customers "via social media" (Opp. at 13). *Compare* O'Connor Decl. Ex. 22 *with* Furey Decl. Exs. B-C). *See* Section IV, *infra*.

     5.     Neither Kimball nor his counsel conducted a trademark clearance search before choosing the name "Milk Street Kitchen." (Opp. at 16-17).  *See* Section V, *infra*.

     6.     The MILK STREET CAFE Mark is a strong trademark (Opp. at 17-18).  *See* Section VI, *infra*.

It is also worth noting that Kimball's repeated reliance on this Court's unpublished decision in *Unleashed Doggie Day Care, LLC v. Petco Animal Supplies*, 2011 WL 6812642 (D. Mass. Dec. 28, 2011) is misplaced.  *Unleashed* was a summary judgment decision where the plaintiff had no trademark registration and failed to prove it had *any* trademark rights whatsoever, which impacted the likelihood of confusion analysis.  *Id.* at *8.  Moreover, the plaintiff failed to address seven of the eight likelihood of confusion factors in opposition to the motion for summary judgment.  *Id.* at *9.  Kimball's attempt to equate the present preliminary injunction motion, where plaintiff's trademark rights and many of the facts underlying the likelihood of confusion analysis are uncontested, with the *Unleashed* case, is remarkable.

## II.    SIMILARITY OF MARKS

Again, Kimball does not dispute that "Milk Street Kitchen" and "Milk Street Cafe" are confusingly similar in sight, sound, and meaning.  (*Compare* Memo. at 9-12 *with* Opp. at 8-10). Kimball instead argues that this Court should ignore Kimball's use of "Milk Street Kitchen" and instead focus on purported "proposed names:" "Christopher Kimball's Milk Street Kitchen" or "Christopher Kimball's Milk Street."  Kimball is well aware that the "change" requested by Milk Street Cafe (and referred to in its Complaint and preliminary injunction papers) was the request not to use "Milk Street" in the name of his Kitchen.  At no time did Kimball agree to change the name to not include "Milk Street Kitchen."  To the contrary, Kimball and his counsel offered to add "Christopher Kimball's" in small font above the larger and bolded "Milk Street" but

3

caveated the offer by stating that Kimball would also need to use the "Milk Street Kitchen" name alone to market and operate his business because "Christopher Kimball's Milk Street Kitchen" is a "mouthful."  (Furey Decl. ¶ 4; Kimball Decl. ¶ 51 (conceding certain uses of its name will require "more succinct wording.")).

Furthermore, the addition of the well-known "Christopher Kimball's" name to the otherwise confusingly similar "Milk Street Kitchen" does not reduce the likelihood of confusion. In reverse confusion cases, the addition of a well-known house brand to an otherwise confusingly similar mark only aggravates the likelihood of reverse confusion.  As the Court explained in *TriMark USA, Inc. v. Performance Food Group Co.* 667 F. Supp. 2d 155 (D. Mass. 2009), "a junior user cannot justify its confusing use of another's mark simply by tacking on its own house mark or trade name.  Such a usage may merely suggest to customers that plaintiff has licensed defendant or that the parties are affiliated in some other way" (quoting *McCarthy on Trademarks and Unfair Competition*, § 24:43 (4th ed. 2008)).  In *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 39 (1st Cir. 2006), the First Circuit held that defendant Maytag's addition of its more well-known house brand "Jenn-Air" before plaintiff's mark only aggravated the likelihood of confusion, explaining that, "since the alleged harm is *reverse* confusion, to the extent Jenn-Air is itself the more recognized label the linkage could actually aggravate the threat to Attrezzi, LLC" (emphasis in original).  Similarly, in *Commerce Bank & Trust Co. v. TD Banknorth, Inc.*, the Court held that the addition of the defendant's well-known "TD" logo to the front of an otherwise confusingly similar mark could increase the likelihood of confusion, explaining that, "because the alleged harm is reverse confusion, to the extent TD Commerce Bank is the more recognized label, the linkage could actually aggravate the threat to plaintiff."  554 F. Supp. 2d 77, 85-86 (D. Mass. 2008) (granting motion for preliminary injunction).

Moreover, Kimball concedes that the "proposed" addition of "Christopher Kimball's" in small font would only be to its logo, and that it would continue to use a shortened form elsewhere. (Furey Decl. ¶ 4; Kimball Decl. ¶ 51). Indeed, as evidenced by its current social media platforms and website, Kimball and its followers often refer to the business simply as "Milk Street Kitchen" and "Milk Street" without "Christopher Kimball." (Furey Decl. Exs. A-C.) The following are a few examples:

1. On Kimball's website (Furey Decl. Ex. D), www.milkstreetkitchen.com, the name "Milk Street Kitchen" is displayed across the top of every page, and the site advertises a job for a graphic designer to assist with "supporting the Milk Street Kitchen brand." (Plevan Ex. 27)[1]. The website also houses a "press kit" for the media where "Milk Street Kitchen" is named throughout (the phrase "Christopher Kimball's Milk Street Kitchen" never appears). (Furey Decl. Ex. D). The home page features the large bold phrase:

    **What is Milk Street Kitchen?**

2. Kimball's Facebook page displays its logo without "Christopher Kimball's" and refers to the venture as simply "Milk Street Kitchen" throughout: (Furey Decl. Ex. B):

    

---

[1] For example, Plevan Ex. 27 at pp.13-14 ("get good kitchen stories for Milk Street Kitchen;" "collaborate with "Milk Street Kitchen;" "collaboration with their producers for Milk Street Kitchen").

    3.    Kimball's Twitter page is named "Milk Street" with a logo that uses "Milk Street" in large bold letters with the smaller "Kitchen" underneath and advertises the hashtags #milkstreetkitchen, #milkstreettv, and #milkstreetrecipes, and promotes the "Milk Street Newsletter," which is addressed to "Milk Streeters" (Complaint, ¶ 32; Furey Decl. Ex. C):




Consumers wishing to follow Milk Street Kitchen and/or Milk Street Cafe on Facebook, for example, are being confronted with content featuring similar images of food under the respective "Milk Street" that are quite similar:




6

8776343.5

Kimball's argument that it can simply add "Christopher Kimball's" in small font above the much larger and confusingly similar "Milk Street" and "Kitchen" in some places but not elsewhere is the same argument the Court rejected in *Boldface Licensing & Branding v. By Lee Tillett, Inc.* 940 F. Supp. 2d 1178, 1187 (C.D. Cal. 2013) (granting motion for preliminary injunction). In *Boldface*, the addition of the Kardashian sisters' well-known names in small font above a confusingly similar mark did not reduce confusion, particularly in light of the fact that it "would often appear in the marketplace alone" without the Kardashian sisters' names, including websites, Facebook, and Twitter pages:

 

Additionally, Kimball focuses exclusively on the logos, ignoring the fact that the respective names are often encountered by consumers in standard characters. The MILK STREET CAFE Mark is a standard character mark "without any claim to any particular font, style, size or color." (Complaint, Ex. A). The MILK STREET CAFE Mark is often encountered by potential consumers as standard characters without any design elements. (*See, e.g.,* O'Connor Decl. Exs. 1-6). Likewise, Kimball's "Milk Street Kitchen" is often encountered by potential consumers as standard characters. (*See, e.g.,* O'Connor Decl., Ex. 11; Plevan Decl. Ex. 4).

### III. CONSUMERS UNDERSTAND THAT CELEBRITIES OFTEN HAVE COOKING SHOWS AND RESTAURANTS

Kimball criticizes Milk Street Cafe's description of Kimball's goods and services as being "in the field of food and cooking" as "self-serving generalizations." (Opp. at 12). In Kimball's trademark applications for his new venture, however, Kimball repeatedly represented to the USPTO that his venture is "in the field of food and cooking." (O'Connor Decl. Exs. 12, 13 & 19).

The issue is not whether the goods and services are related in the abstract, it is whether consumers believe that such goods and services—even if unrelated—come from the same source. Kimball's belief that "[a] national publisher with a multimedia platform (such as my business) has nothing in common with a local corporate caterer and cafe (such as Mr. Epstein's business)" (Kimball Decl. ¶ 29) exemplifies the fallacy in Kimball's argument because it focuses on *Kimball's* misguided belief rather than the perception of consumers. The case of *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658 (5th Cir. 2000) is illustrative. In *Westchester*, the junior user was a media company (like Kimball) that sought to expand into the field of lifestyle and fashion magazines using the name "Polo," while the senior user was the fashion designer Ralph Lauren that owned the mark POLO. *Id.* Despite the fact that the junior user was a media company and the senior user was a fashion designer with no overlapping products or services, the Court found that *consumers* would likely believe the respective services come from the same source. *Id.* (whether the fashion designer "could ever successfully publish a magazine is not the issue here; consumer perception is the issue."). Here, it is irrelevant whether Kimball's media company, which Kimball represented to the USPTO is "in the field of food and cooking," ever intends to open a restaurant—consumer perception will likely be that Kimball, like other celebrities with cooking shows, opened a cafe down the street from "Milk Street Kitchen," and named it "Milk Street Cafe." *See also* Memo at 12-13 (citing USPTO's rejection of the MILK STREET DISTILLERY Mark for distilled spirits as likely to cause confusion with the MILK STREEET CAFE Mark because consumers are likely to believe products come from the same source, and *Polar Corp.*, 789 F. Supp. 2d at 233).[2]

---

[2] Kimball offers the legally unsupported argument that an examiner's failure to cite the MILK STREET CAFE Mark during prosecution of Kimball's trademark application is somehow persuasive. (Opp. at 12) The cases Kimball cites are inapposite because they do not address the failure to cite a mark for likelihood of confusion during prosecution. The *TriMark* case from this District expressly rejected this same

8
8776343.5

## IV. SIMILAR CHANNELS OF TRADE AND ADVERTISING

Kimball does not dispute that it and Milk Street Cafe both communicate with customers and potential customers "via social media" (Opp. at 13). (*Compare* O'Connor Decl. Ex. 22 *with* Furey Decl. Exs. B-C). Moreover, just like Milk Street Cafe's catering customers may order online using the Milk Street Cafe website, milkstreet.com, Kimball's followers can register for classes and sign up for the "Milk Street Newsletter" via its website, milkstreetkitchen.com. (O'Connor Decl. Exs. 20-21; Furey Decl. Ex. A). Kimball's efforts to distance itself from Milk Street Cafe by stating that its location up the street from Milk Street Cafe "will *not* be open to the public" lacks credibility, as the public has been invited to sign up for cooking classes, to view the TV show, and come by for a tour. (Opp. at 14 (emphasis in original)). In his letter to invite consumers to sign up for his magazine, Kimball states: "Why do we call it *Milk Street Kitchen*? Well, our new kitchen is at 177 Milk Street in downtown Boston. You can take classes at our Milk Street Cooking School. You can watch us film our new TV show there. Or you can just stop by for a quick tour." (Furey Decl. Ex. E). Kimball also publicized that an "open house at the Milk Street Kitchen headquarters is planned for the fall or spring." (Furey Decl. Ex. F.)[3]

## V. KIMBALL DOES NOT DISPUTE THAT IT FAILED TO CONDUCT A TRADEMARK CLEARANCE SEARCH

While Kimball discloses that his attorneys filed the trademark applications for "Milk Street Kitchen" (Kimball Decl. ¶ 14), conspicuously absent from any of the papers is any

---

argument, stating that the examiner's failure to cite the mark is entitled to "no weight" because "there is no indication that the PTO actually compared the logos 'much less that it found the marks not to be confusingly similar.'" *TriMark*, 667 F. Supp. 2d at 164 (quoting *Kos Pharm, Inc. v. Andrx Corp.*, 369 F.3d 700, 714-15 (3d Cir. 2004)).

[3] Kimball's argument that he does not consider himself a chef is irrelevant – it only matters what the *public* considers Kimball. Kimball is no doubt well aware that the public considers him to be a "celebrity chef." (Furey Decl. Ex. H).

9

statement that his counsel conducted a trademark clearance search beforehand. This is surprising considering Kimball's reliance on the *Unleashed* case throughout its Opposition ("*passim*"). In that case, this Court noted that, "prior to selecting the name 'Unleashed by Petco' for its new concept store and registering that mark, Petco conducted a comprehensive trademark search." 2011 WL 6812642 at *15. Here, Kimball and his wife "concluded that there would be no legal impediment" despite the fact that neither Kimball nor his wife are trademark attorneys. (Opp. at 17). The only reasonable conclusion to be drawn is either: (1) no trademark clearance search was conducted prior to deciding to proceed with "Milk Street Kitchen;" or (2) Kimball intentionally chose not to disclose the fact that it had conducted a clearance search (and its results) in light of the case law set forth in Milk Street Cafe's motion explaining that, in a reverse confusion case, "the intent inquiry must focus on 'whether the defendant was aware of the senior user's use of the mark in question, or whether the defendant conducted an adequate name search for other companies marketing similar goods or services under that mark.'" *Boldface*, 940 F. Supp. 2d at 1195 (quoting *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 444 (3d Cir. 2000)). Kimball's silence is telling.[4]

## VI. KIMBALL MISAPPREHENDS THE "RELATIVE STRENGTH" FACTOR

Kimball misapprehends the concept of *relative* strength. Conceding for purposes of the preliminary injunction motion that the MILK STREET CAFE Mark is a valid and thus distinctive mark, and not contesting that it is a strong mark, Kimball concludes without citation to any authority that Milk Street Cafe's 35 years of use and over $2 million to promote the brand "strongly favors Defendant." (Opp. at 18.) Kimball's conclusion is contrary to law. *See Visible Sys. Corp. v. Unisys. Corp.*, 551 F.3d 65, 74 (1st Cir. 2008) ("In a reverse confusion case, the

---

[4] Kimball also does not claim to have done an internet search (e.g. Google) prior to selecting a name.

8776343.5

focus is on the relative strength of the marks so as to gauge the ability of the junior user's mark to overcome the senior user's mark.")  In *Visible Sys.*, the First Circuit held that a reasonable jury could have concluded that plaintiff's engagement in a nationwide marketing campaign, 20 years of use and "over $2 million to promote the mark . . . established the identity of [plaintiff's] mark, but did not prevent the mark from being overwhelmed by [defendant's] mark." *Id.*  Here, Milk Street Kitchen was announced only a month ago and has not opened, yet its Facebook page "already has approximately 80,000 followers" (Kimball Decl. ¶ 44) compared to Milk Street Cafe's 1,800 Facebook followers (Supp. Epstein Decl. ¶ 16).  Thus, relative strength of the marks strongly favors Milk Street Cafe.

**VII.    KIMBALL'S EFFORTS TO DIMINISH THE EVIDENCE OF ACTUAL CONFUSION IS UNAVAILING**

At this early stage, where Kimball only announced his new venture a month ago and is not scheduled to open until this fall, no evidence of actual confusion is necessary.  *Borinquen*, 443 F.2d at 121 ("a trademark holder's burden is to show likelihood of confusion, not actual confusion.")  However, when a junior user, like Kimball, has yet to or only recently launched, "courts view such evidence as strongly supporting a likelihood of confusion." 5 -5 *Gilson on Trademarks*, § 5.04 (2006).  It is thus no surprise that Kimball devotes significant attention to attacking Milk Street Cafe's evidence of actual confusion.  (Opp. at 3-7.)  Even a single example of actual confusion occurring before the defendant launches may support a likelihood of confusion.  *Dominion Bankshares Corp. v. Devon Holding Co.* 690 F. Supp. 338, 344 (E.D. Pa. 1988) (granting preliminary injunction before defendant opened for business, noting single example of actual confusion already existed); *Whipps, Inc. Ross Value Mfg. Co.*, 2014 U.S. Dist. LEXIS 63767 (D. Mass. May 8, 2014) (granting preliminary injunction, identifying one instance of actual confusion).

Evidence of actual confusion can take many forms and does not require a consumer to have purchased the products or services of one assuming it was the other since the junior user that has yet to launch does not yet have products to purchase.  Moreover, "[c]onfusion includes not only consumer confusion, but confusion by prospective employees." *Aura Commc'ns, Inc. v. Aura Networks, Inc.*, 148 F. Supp. 2d 91, 96 (D. Mass. 2001).  As the Ninth Circuit explained when reversing a district court's finding that there was no evidence of actual confusion:

> [I]t appears to be a matter of basic common sense to recognize the very real possibility that confusion on the part of at least certain non-consumers could either: (1) turn into actual consumer confusion (i.e. potential consumers); (2) serve as an adequate proxy or substitute for evidence of actual consumer confusion (i.e., non-consumers whose confusion could create an inference of consumer confusion) or (3) otherwise contribute to confusion on the part of the consumers themselves (i.e., non-consumers whose confusion could influence consumer perceptions and decision-making.).

*Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190 (9th Cir. 2012).

Here, prior to Kimball's launch, there have already been at least 6 misdirected emails sent to Milk Street Cafe by people believing they were seeking jobs from Milk Street Kitchen, and evidence of consumers who thought that there was an affiliation between Milk Street Cafe and Milk Street Kitchen.  (Motion at 15-16) (Epstein Aff. ¶¶ 41-44 & Exs. 7-13; Beth Epstein Aff.); *Attrezzi*, 436 F.3d at 40 (Misdirected emails are evidence of actual confusion.); *I.H.T. Corp. v. News World Comuns., Inc.*, 1984 U.S. Dist. LEXIS 15260, *39.

Kimball's remaining arguments are based on the erroneous conclusion that actual confusion must "lead to a loss of business."  (Opp. at 5.)  As explained above, the evidence of actual confusion need not directly evidence a loss of business, but may instead evidence confusion as to an affiliation.  *Boustany*, 42 F. Supp. 2d at 110-111 (questions whether respective businesses are affiliated evidences actual confusion).  Furthermore, on June 1, 2016—the same day Kimball issued a press release announcing "Milk Street Kitchen"—a customer of both

Kimball and Milk Street Cafe posted on her Facebook page her belief that Kimball and Milk Street Cafe were in "collaboration." (Maguire Affidavit).[5] Contrary to Kimball's argument that he will not benefit from any confusion, Ms. Maguire would have signed up for Kimball's cooking school because she thought it was affiliated with Milk Street Cafe. (*Id.*).

**VIII.   THERE IS A STRONG LIKELIHOOD OF IRREPARABLE HARM**

Kimball attempts to dramatically alter the preliminary injunction standard by arguing that none of the evidence submitted by Milk Street Cafe establishes that Kimball's infringement "has caused" Milk Street Cafe to suffer irreparable injury. (Opp. at 18). Kimball misstates the law. First, "[d]irect evidence is not . . . an absolute prerequisite. This concept dovetails neatly with the lessened proof requirements that apply at the preliminary injunction stage." *Borinquen Biscuit Corp. v. M.V. Trading Corp.* 443 F.3d 112, 122 n.4 (1st Cir. 2006). Second, the irreparable harm factor assesses whether a plaintiff "may" suffer irreparable harm, not whether defendant already "has caused" irreparable harm, as Kimball argues. *Greene v. Ablon*, No. 09-10937-DJC, 2012 WL 6597779, at *3 (D. Mass. Dec. 17, 2012) (granting preliminary injunction, finding irreparable harm because defendant's unauthorized use of plaintiff's mark "may damage MGH's reputation and goodwill."). This is because "[p]revention of confusion is … the touchstone of trademark protection." *Dorpan, S.L. v. Hotel Melia, Inc.*, 728 F.3d 55, 61 (1st Cir. 2013). As the First Circuit explained, irreparable harm in a reverse confusion trademark case occurs when the senior trademark user faces the risk that it "is overwhelmed by a more commercially powerful junior user, causing the senior user to lose control over its brand and its

---

[5] Milk Street Cafe did not become aware of this private Facebook post from a third-party until after it filed its Complaint and motion for preliminary injunction papers.

goodwill." *Id.*, 728 F.3d at 65. This is the very essence of irreparable harm in a trademark case and why granting a preliminary injunction *before* such harm occurs is necessary:

> A likelihood of damage to reputation is by its nature "irreparable." Like trying to un-ring a bell, trying to "compensate" after the fact for damage to business goodwill and reputation cannot constitute a just or full compensation. This distinguishes trademark cases from the neighboring areas of patent and copyright law.

5 McCarthy on Trademarks and Unfair Competition § 30:37 (4th ed. 2014).

As this Court explained in *Ablon*, once the owner's rights in the mark and likelihood of confusion are established, a trademark owner faces irreparable harm as a result of the infringer's use of the marks:

> Any such use in ways not authorized by MGH may damage MGH's reputation and goodwill. *See Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 & n. 7 (1st Cir.1996) (holding that damage to reputation and goodwill was sufficient to justify preliminary injunctive relief). Namely, Greene is currently using the CPS Marks in ways not directed by MGH and not under its auspices, despite its ownership of same.

2012 WL 6597779, at *3. Here, Kimball concedes for purposes of the preliminary injunction that Milk Street Cafe owns valid trademark rights in the MILK STREET CAFE Mark. (Opp. at 3). Additionally, Milk Street Cafe has sufficiently established a likelihood of reverse confusion, as set forth in its memorandum and supporting papers. As explained in its opening memorandum, any continued infringement by Kimball of the MILK STREET CAFE Mark may cause Milk Street Cafe to lose control of its brand and damage Milk Street Cafe's reputation and goodwill. (Memo. at 8-19; *see also* Supp. Epstein Decl. ¶¶ 6-18). Milk Street Cafe is seeking a preliminary injunction in order to protect its ability to control the goodwill and reputation associated with its MILK STREET CAFE Mark that it has spent 35 years building without being tied to the reputation of a celebrity.

Having no rebuttal to this, and despite conceding that the First Circuit has not held that *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) eliminated the presumption of irreparable harm in trademark cases, Kimball resorts to misrepresenting to this Court that Milk Street Cafe "cites only to First Circuit cases that were decided *before* the Supreme Court's decision in *eBay*." (Opp. at 2 (emphasis in original)). This is incorrect. On page 18 of its Memorandum, Milk Street Cafe cites *Visible Sys. Corp. v. Unisys Corp.*, 551 F.3d 65 (1st Cir. 2008), decided two years *after* the *eBay* decision, whereby the First Circuit affirmed the district court's grant of a permanent injunction in a reverse confusion trademark case.[6] Additionally, Milk Street Cafe cited to several district court cases within the First Circuit granting preliminary injunctions after *eBay,* including: *TriMark*, 667 F. Supp. 2d 155 (D. Mass. 2009) ("Where, as here, the plaintiff demonstrates a likelihood of success on the merits of its trademark infringement claim, it is presumed that without injunctive relief it will be irreparably harmed."); *Commerce Bank & Trust Co. v. TD Banknorth, Inc.*, 554 F. Supp. 2d 77, 87 (D. Mass. 2008) ("In the context of trademark litigation, irreparable harm is generally presumed if a plaintiff demonstrates a likelihood of success on the merits."); and *Polar Corp. v. Pepsico*, 789 F. Supp. 2d 219 (D. Mass. 2011) ("In the context of trademark litigation, irreparable harm is generally presumed if a plaintiff demonstrates a likelihood of success on the merits.").

---

[6] The Supreme Court's *eBay* decision concerned a *permanent* injunction in a patent case. Noteworthy is that, while the First Circuit has not decided the issue, the District of Massachusetts has held since *eBay* that, "[w]ith a presumption of irreparable harm in place in trademark cases, the Court can apply the presumption to the present facts. Moreover, applying the First Circuit's 'sliding scale,' the strong showing of a likelihood of success on the merits relaxes the requirement of irreparable harm." *Dunkin' Donuts Franchised Restaurants LLC v. Wometco Donas Inc.*, 53 F. Supp. 3d 221, 231 (D. Mass. 2014) (granting preliminary injunction); *cf. Dorpan*, 728 F.3d at 62 ("a plaintiff who holds an incontestable registered mark is generally entitled to a preliminary injunction enjoining an allegedly infringing party."). Other Circuit Courts agree. *See, e.g., Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013) (applying presumption of irreparable harm post-*eBay*); *Community of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1012 (8th Cir. 2011) (applying presumption of irreparable harm post-*eBay*).

15

As set forth herein and throughout its opening memorandum, even without the presumption of irreparable harm, Milk Street Cafe has demonstrated that Kimball's unauthorized use of its confusingly similar "Milk Street Kitchen" name may damage Milk Street Cafe's reputation and goodwill and cause Milk Street Kitchen to overwhelm and overcome Milk Street Cafe's brand.  *See* Memo. at 8-19; *see also generally*  Decl. and Supp. Decl. of Epstein)

## IX.    KIMBALL'S BALANCE OF EQUITIES ARGUMENT LACK CREDIBILITY

While Kimball argues that a preliminary injunction in this case would unfairly prevent him from launching his new venture announced only a month ago, failing to grant a preliminary injunction will permanently will allow Kimball to overwhelm Milk Street Cafe and deprive Milk Street Cafe of the goodwill and control over the brand that it has spent 35 years building.  For example, although Milk Street Kitchen was announced only a month ago and is not yet open, its Facebook page "already has approximately 80,000 followers" (Kimball Decl. ¶ 44) compared to Milk Street Cafe's 1,800 Facebook followers (Supp. Epstein Decl. ¶ 16).  Kimball's argument that it would have to change its "social media platforms" is disingenuous considering it has already volunteered to do so for two different "proposed names."  (Opp. at 8.)  Additionally, Kimball's argument that a preliminary injunction would "affect" its upcoming "live events which begin after Labor Day (including stage dressing, ticketing, and marketing)" is misleading.  (Op. at 19 (quoting Kimball Decl. ¶ 47)).  Kimball fails to disclose in any of its papers that these upcoming "live events" are being marketed as "Christopher Kimball Live – The Culinary Mystery Tour," not "Milk Street Kitchen."  (Furey Decl. Ex. B at 5; *www.milkstreetkitchen.com/events/cpklive*).

Kimball was put on notice of Milk Street Cafe's trademark rights two days after it issued its press release announcing "Milk Street Kitchen."  (Plevan Decl. Ex. 1).  Similar to the present

16

case is that of *Trimark*, where the Court held the balance of equities weighed in favor of plaintiff, explaining that the plaintiff "gave [defendant] notice of its infringement claim after the very first public announcement of the new mark.  To the extent that [defendant] elected to proceed to roll-out its new logo, it did so at its own risk." 667 F. Supp. 2d at 170.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | MILK STREET CAFE, INC. |
|  | By its attorneys, |
| Dated: July 21, 2016 | */s/ Jennifer B. Furey*<br>Jennifer B. Furey (BBO No. 634174)<br>Andrew T. O'Connor (BBO No. 664811)<br>GOULSTON & STORRS PC<br>400 Atlantic Avenue<br>Boston, Massachusetts 02110<br>P:  (617) 482-1776<br>F:  (617) 574-4112<br>*jfurey@goulstonstorrs.com*<br>*aoconnor@goulstonstorrs.com* |

## **CERTIFICATE OF SERVICE**

I hereby certify that, on July 21, 2016, I electronically filed the foregoing with the Clerk's Office using the Court's CM/ECF system, which will send notification of this filing (NEF) to all registered participants, and paper copies will be sent to those indicated as non-registered participants.

*/s/ Jennifer B. Furey*
Jennifer B. Furey