UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
MILK STREET CAFE, INC.,                    :
                                              :
     Plaintiff,                            :
                                              :
     v.                                    :
                                              :
CPK MEDIA, LLC, d/b/a                      :
MILK STREET KITCHEN,                       :
                                              :
     Defendant.                            :
                                              :    Civil Action
- - - - - - - - - - - - - - - - - - - - - - - - - - - x   No. 16-11416-DJC
CPK MEDIA, LLC,                            :
                                              :    **ORAL ARGUMENT REQUESTED**
     Counterclaim-Plaintiff,               :
                                              :
     v.                                    :
                                              :
MILK STREET CAFE, INC.,                    :
                                              :
     Counterclaim-Defendant.               :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**CPK MEDIA, LLC'S MEMORANDUM OF
LAW IN SUPPORT OF ITS MOTION TO STRIKE
THE TESTIMONY AND REPORT OF RENE BEFURT, PH.D.**

Scott T. Lashway
Dawn L. Rudenko
Christopher M. Iaquinto
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116

**REDACTED PURSUANT TO DKT. NO. 66**

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ...............................................................................................................2

    A.     Befurt Is Not Qualified To Offer An Opinion In This Case ...................................3

    B.     Befurt's Testimony Fails To Satisfy The *Daubert* Standard For Scientific Expert Testimony..........................................................................................5

          1.     Befurt's Opinion That The Sowers Survey Sample Universe Is Improper Is Not Based on the Correct Methodology..................................5

          2.     Befurt's Adjusted Data Is Not Based On Any Accepted, Scientific Methodology ............................................................................................8

          3.     Befurt Is Not Relying On His Adjusted Data In Support Of His Opinions That The Sowers Survey Sample Universe And Control Stimuli Are Improper ...................................................................................9

          4.     Befurt's Adjusted Data Is Biased, Statistically Unreliable, And Irrelevant To The Present Matter.............................................................10

CONCLUSION.............................................................................................................12

**REDACTED PURSUANT TO DKT. NO. 66**

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Bogosian v. Mercedes-Benz of North America, Inc.*,
   104 F.3d 472 (1st Cir. 1997) ...................................................................................4

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996) .......................................................................................3

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ................................................................................3, 5, 6, 10

*Kumho Tire Co., Ltd. v. Carmichael*,
   119 S. Ct. 1167 (1999) ..........................................................................................10

*Levin v. Dalva Brothers, Inc.*,
   459 F.3d 68 (1st Cir. 2006) ..................................................................................3, 4

*Mastercard Intern. Inc. v First Nat. Bank of Omaha, Inc.*,
   No. 02-3691, No. 03-707, 2004 WL 326708 (S.D.N.Y. 2004) .............................11

*McGovern v. Brigham & Women's Hospital*,
   584 F. Supp. 2d 418 (D. Mass. 2008) ..........................................................2, 8, 10

*President and Trustees of Colby College v. Colby College-New Hampshire*,
   508 F.2d 804 (1st Cir. 1975) ..................................................................................9

*Samaan v. St. Joseph Hosp.*,
   670 F.3d 21 (1st Cir. 2012) ..................................................................................3, 7

*Irvine v. Murad Skin Research Labs., Inc.*,
   194 F.3d 313 (1st Cir. 1999) ..................................................................................3

*Spraying Sys. Co. v. Delavan, Inc.*,
   762 F. Supp. 772 (N.D. Ill. 1991), *aff'd*, 975 F.2d 387 (7th Cir. 1992) ..................6

*Tokidoki, LLC v. Fortune Dynamic, Inc.*,
   No. 07-1923, 2009 WL 2366439 (C.D. Cal. July 28, 2009) ....................................6

*Yankee Spirits, Inc. v. Gasbarro*,
   No. 96-10967, 1998 WL 428092 (D. Mass. May 26, 1998) ....................................9

**Other Authorities**

Fed. R. Evid. 403 .......................................................................................................2

Fed. R. Evid. 702 ..............................................................................................2, 3, 5, 7

REDACTED PURSUANT TO DKT. NO. 66

## PRELIMINARY STATEMENT

Milk Street Cafe, Inc. ("Cafe") submitted the Revised Expert Rebuttal Report of Rene Befurt, Ph.D., dated June 13, 2017 ("Befurt" and "Befurt Report")[1] to rebut the Expert Report of Brian Sowers, dated May 26, 2017 ("Sowers" and "Sowers Report"),[2] offered by CPK Media, LLC ("CPK Media").

Sowers designed and implemented two surveys -- one directed to potentially past and prospective Cafe _restaurant_ customers, and one directed to potentially past and prospective Cafe _catering_ customers (together "Sowers Survey").  The Sowers Survey results establish that MILK STREET CAFE (the "Cafe Mark") has not acquired secondary meaning.

Befurt offers a critique of the Sowers Survey.  He does not contest the methodology employed in the surveys, but rather criticizes two discrete issues:  (1) the 50 mile sample universe radius, and (2) the control stimuli (Main Street Cafe).  Befurt lacks sufficient qualifications to offer such opinions; his specialization in marketing include marketing strategy, marketing research, and consumer decision-making.  He has no relevant experience in designing and implementing secondary meaning surveys, or in analyzing them as he attempts here.

Befurt's conclusions in Section III.A. of his report, relating to the Sowers Survey sample universe, are also wholly unreliable.  Befurt does not base his opinion on the proper facts or data in determining the proper sample universe.  He failed to determine or consider where the Cafe markets and advertises its services under the Cafe Mark.  He instead relies solely on excerpts from Marc Epstein's deposition (Cafe owner) as to where the "majority" of the Cafe's historical

---

[1] All references to "Ex.__" in this Memorandum refer to those exhibits identified in the Declaration of Christopher M. Iaquinto, June 28, 2017 ("Iaquinto Dec.") submitted to this Court on June 28, 2017.

Ex. 1, Befurt Report: Befurt submitted a previous report dated June 5, 2017. The June 13, 2017 report is a revised. report. For purposes of this motion all references to the "Befurt Report" are referring to the June 13 revised report.

[2] The Sowers Report is at Ex. 2.

**REDACTED PURSUANT TO DKT. NO. 66**

sales derive or catering orders delivered.  Accordingly, the underlying foundation of his conclusions are wrong.

Section IV of the Befurt Report is no more than an attempt by the Cafe to do an end-run around the fact that it did not perform its own secondary meaning survey by offering what appears, at least on its face, to be contradictory secondary meaning survey results.  Indeed, Befurt testifies:

> **I didn't do an analysis of a secondary meaning survey**. In the end my assignment is to look at Mr. Sowers' survey, and I show, when I **adjust the sample**, how drastically the results differ and how drastically his net percentage that speaks to secondary meaning differs.

But he did not rely on his altered data in support of his opinions relating to sample universe or control stimuli, rather as some sort of undefined check on his opinions.  And he is not offering an opinion as to whether the Cafe Mark has acquired secondary meaning.  Yet, he claims that his adjusted data "reveals" a "higher recognition of Milk Street Cafe as one particular company." Befurt's adjusted data is not based on any accepted methodology.  It is also unreliable and not capable of validation.  Accordingly, it should be excluded.

For these reasons, more fully discussed below, Befurt's Report and opinions violate Federal Rules of Evidence 403 and 702; accordingly, CPK Media moves to exclude such opinions and to preclude Befurt's testimony on the above opinions at trial.

## ARGUMENT

In analyzing the admissibility of expert testimony, this Court, as part of its gate-keeping role, must determine "whether the expert possesses some specialized knowledge such that his or her testimony will be helpful to the trier of fact."  *McGovern v. Brigham & Women's Hospital*, 584 F. Supp. 2d 418, 423 (D. Mass. 2008); Fed. R. Evid. 702.

REDACTED PURSUANT TO DKT. NO. 66

If found qualified, this Court must then determine whether Befurt's (1) "[t]estimony is based upon sufficient facts or data," (2) "[i]s the product of reliable principles and methods, and (3) that he "[h]as reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702*; see Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 32 (1st Cir. 2012) ("t]he scope of a *Daubert* [inquiry] is not limited to an appraisal of an expert's credentials and techniques but also entails an examination of his conclusions to determine whether they flow rationally from the methodology employed.").  An expert's testimony must also be based on facts, rather than speculation.  *See Irvine v. Murad Skin Research Labs., Inc.*, 194 F.3d 313, 321 (1st Cir. 1999) ("Absent adequate factual data to support the expert's conclusions his testimony was unreliable."); *see also Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996).

Befurt's proffered opinions fail to meet these threshold requirements.  He lacks any specialized knowledge or expertise to opine on secondary meaning or a secondary meaning consumer survey.  His opinions are nothing more than conjecture based on insufficient facts and data, without any application of accepted, scientific methodology.

## A.   Befurt Is Not Qualified To Offer An Opinion In This Case

Befurt must be qualified "by knowledge, skill, experience, training or education."  Fed. R. Evid. 702; *Levin v. Dalva Brothers, Inc.*, 459 F.3d 68, 78 (1st Cir. 2006) (Under Rule 702 "[a] testifying expert should have achieved a meaningful threshold of expertise in the given area."). Befurt's fields of specialization within marketing include marketing strategy, marketing research, and consumer decision-making.  *See* Ex. 1, Befurt Report, ¶ 3.   In his role at Analysis Group, he predominately assists experts in consulting with commercial entities relating to brand and marketing issues.  *Id.*  He has been retained as an expert four times, none of which relate to the design or analysis of secondary meaning surveys.  *Id.*, ¶ 4; Ex. 3, June 14, 2017 Deposition Transcript of Rene Befurt ("Befurt Dep.") at 35:14 – 36:1.  Befurt's academic background is

3

focused on issues of marketing research, product design, branding, and pricing, and their roles in consumer choice and marketing strategy.  *See* Ex. 1, Befurt Report, ¶ 3.

Befurt has no history as an expert relating to secondary meaning surveys.  *See* Ex. 1, Befurt Report, ¶ 4; Ex. 3, Befurt Dep. at 28:3-14.  He has never designed a secondary meaning survey.  *Id.* at 28:3-14.  He has never rebutted a secondary meaning survey.  *Id.* at 28:3-6.  And aside from assisting an expert in a litigation some 3-5 years ago, that he believes had a secondary meaning component, Befurt was unable to identify a matter (litigation or otherwise) where he assisted an expert in the design or analysis of a secondary meaning survey.  *Id.* at 27:3-28:2.

While Befurt might be qualified to opine on appropriate methodology for branding surveys in general, he has no experience or expertise in designing or analyzing secondary meaning surveys.  *See Levin*, 459 F.3d at 78 (although "a witness qualifies as an expert with respect to certain matters or areas of knowledge, [does not mean] that he or she is qualified to express expert opinions as to other fields") (internal citation omitted); *Bogosian v. Mercedes-Benz of North America, Inc.*, 104 F.3d 472, 477 (1st Cir. 1997) (upholding district court exclusion of expert witness, who had extensive experience in automotive repair, but lacked expertise with design defect issues).  His lack of experience relating to secondary meaning surveys is evidenced throughout his report and testimony.  For example, Befurt was unable to describe the differences between "secondary meaning" and "brand awareness."  Ex. 3, Befurt Dep. at 157:14-16 ("And I haven't considered the equality of these two expressions carefully because I focus on **recognition of a brand**.").  Accordingly, Befurt's proffered opinion fails to satisfy Rule 702 and should therefore be excluded from trial.

4

**B.      Befurt's Testimony Fails To Satisfy
         The _Daubert_ Standard For Scientific Expert Testimony**

**1.      Befurt's Opinion That The Sowers Survey Sample Universe Is
         Improper Is Not Based on the Correct Methodology**

To identify the proper geographic region of the sample universe, an expert must consider

where and how the company markets and advertises its services under the trademark.  McCarthy,

§ 15:52.  The geographic region must consist of potential past and prospective customers who

are "exposed to this designation used as a trademark."  _Id._

In his analysis, Befurt made no attempt to determine the geographic region of the Cafe's

potential past and prospective customers who are "exposed" to the Cafe Mark.  He does not

know the Cafe's channels of marketing.  _See_ Ex. 3, Befurt Dep. at 149:3-9.  He does not know

where the Cafe markets its restaurant and catering services under the Cafe Mark.  _Id._ at 148:23 –

149:2.  He did not read the deposition of the Cafe's Marketing Director.  _Id._ at 115:9-11.

Significantly, Befurt testified that Sowers would need to know these things to design the survey,

but that he did not need to know them to critique the survey.  _See_ Ex. 3, Befurt Dep. at 159:12-

160:7.

Instead, Befurt's conclusion that the Sowers Survey sample universe is likely over-

inclusive is based _solely_ on _select_ deposition testimony of Marc Epstein (owner of the Cafe).

_See_ Ex. 1, Befurt Report, ¶¶ 17, 23; Ex. 3, Befurt Dep. at 9:3-6.  Befurt never spoke with Epstein

in preparation of his report.  _Id._ at 10:1-3.  And he ignores or grants little weight to Epstein's

other testimony regarding the Cafe's sales territories, order delivery territories, or scope of

marketing and advertising of the Cafe's services under the mark.[3]  Indeed, Befurt testified that he

only read "sections" and "skipped sections" of Epstein's deposition.  _Id._ at 114:20 – 115:4-8.  In

---

[3] Ex. 4, April 5, 2017 Deposition Transcript of Marc S. Epstein at 136:5-138:21 (delivery zones); 138:22-143:16
(sales zones); 143:17-154:2 (marketing and advertising efforts).

5

arriving at his conclusions, Befurt simply relies on Epstein's testimony that he believes that the



, and the

(which Befurt calculates to

).[4]   *See* Ex. 1, Befurt Report, ¶¶ 17; 23; *see also* Ex. 3, Befurt Dep. at 154:24

– 155:5 (focusing the sample to where the majority of existing sales of the Cafe have been

historically); *Id.* at 180:18-24 ("I think repeat customers who appreciate the Cafe [are] more

likely to be able to identify and recognize it.").

Befurt's conclusion based solely on Epstein's unsubstantiated testimony regarding where

the Cafe's historical sales have been, and that the focus should be on the geographic region of the

Cafe's historical sales is wrong as a matter of law.  Not only does Befurt's opinion fail to rest

upon a "reliable foundation," courts routinely exclude consumer surveys where the geographic

region is limited to past or the majority of sales of the company.  *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).  *See also Tokidoki, LLC v. Fortune Dynamic,*

*Inc.*, No. 07-1923, 2009 WL 2366439 at *9 (C.D. Cal. July 28, 2009) ("focus on geographic

regions in which [Plaintiff's] sales are greatest was also inappropriate."); *Spraying Sys. Co. v.*

*Delavan, Inc.*, 762 F. Supp. 772, 779 n.7 (N.D. Ill. 1991) (plaintiff's survey lacked probative

value because three of the five states that made up the relevant universe were plaintiff's strongest

states for sales), *aff'd*, 975 F.2d 387 (7th Cir. 1992).  The proper geographic region of the sample

universe is where the Cafe's potential past and prospective customers are "exposed" to the Cafe

Mark.  *See* McCarthy, § 15:52.  Befurt did not attempt to determine the proper geographic region

of the Cafe's potential past and prospective customers who are exposed to the Cafe Mark.

---

[4] Befurt relies on Epstein's testimony -- that the
to recalculate the Sowers Survey sample universe to include only respondents who
.  *See* Ex. 1, Befurt Report, ¶¶ 30, 36.

REDACTED PURSUANT TO DKT. NO. 66

Equally significant, Befurt does not identify what the proper sample universe should be – only that Sowers' sample is wrong.  Regarding the sample universe for the Cafe's <u>restaurant</u> services, Befurt testifies:

> Q. Is it your testimony that only people that work within walking distance of the Cafe are proper respondents for the purposes of proving secondary meaning?
>
> A. That is not my testimony. I already mentioned to you, and I wrote in my report, that -- I had used the word "majority." So I would have the majority of these in my sample. **But, frankly, I haven't devised this survey. I haven't thought about carefully who I would sample and how I would do it.** All I am saying is that Mr. Sowers' sample is not sufficient.

Ex. 3, Befurt Dep. at 128:8-19 (emphasis added).  Regarding the sample universe for the Cafe's <u>catering</u> services, Befurt testifies:

> Q. What's a proper survey radius for a catering survey?
>
> A. In this specific case? It's hard to say. I think **I probably would reasonably look** ██████████████████████████, because Mr. Epstein ████████████████████████████████████████████████ ████. But, again, building a sample takes time, **and I would have to look at it more carefully.**
>
> Q. So you haven't made a determination as to what the proper sample radius should be in this case for catering customers?
>
> A. **I have not, with full certainty, determined a proper sample, neither by radius nor by anything else.** In my report, as part of my opinion, **I don't offer the appropriate sample for this survey.** It's a tough and tall order.

*Id.* at 138:22 – 139:13 (emphasis added).  Befurt fails to explain how he can affirmatively conclude that the Sowers Survey sample universe is improper without knowing this fundamental information.  His failure to consider and understand the above essential types of information relevant to the determination of a proper sample region violates the basic tenets of Fed. R. Evid. 702.  Fed. R. Evid. 702*; see Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 32 (1st Cir. 2012).

**REDACTED PURSUANT TO DKT. NO. 66**

Where, as here, "there is simply too great an analytical gap between the data and the opinion proffered" the opinion must be excluded. *McGovern*, 584 F. Supp. 2d at 426. Accordingly, Section III.A. of Befurt's Report (and any attendant testimony) should be excluded.

### 2.    Befurt's Adjusted Data Is Not Based On Any Accepted, Scientific Methodology

Befurt did not design and implement a secondary meaning survey on behalf of the Cafe. *See generally,* Ex. 1, Befurt Report; Ex. 3, Befurt Dep. at 28:7-14.  Neither is he offering an opinion as to whether the Cafe Mark has acquired secondary meaning.  *See e.g.,* Ex. 1, Befurt Report, ¶ 41; Ex. 3, Befurt Dep. at 206:19-23.  Instead, in Section IV of his report, Befurt includes tables of adjusted data, derived from him performing a series of calculations of select portions of the Sowers Survey data.  *See* Ex. 1, Befurt Report, ¶¶ 30, 31, 36, 38, 40.

To arrive at his adjusted data, Befurt twists the Sowers data into a pretzel.  He: (1) materially narrows the sample universe; (2) removes the Sowers Survey Control Group;[5] (3) adjusts the geographic region of the sample universe from 50 miles to 5 and 10 miles from the Cafe; and (4) creates his own "narrative control group," derived from the Sowers Survey Test Group, based on respondents' open-ended questions suggesting that they were guessing as to MILK STREET CAFE being associated with "one particular company."  *See* Ex. 1, Befurt Report, ¶¶ 34, 37.  The obvious effect of Befurt's manipulated calculations is that a higher percentage of survey respondents identify the Cafe as being associated with "one particular company," and that some of Befurt's "net recognition" percentages fall above[6] the threshold

---

[5] For each survey, Sowers included a "Test Group" -- respondents shown the Cafe Mark, and a "Control Group" -- respondents shown the control, Main Street Cafe. *See* Ex. 2, Sowers Report, ¶¶ 24, 26.

[6] Notably, some of the net results (even under Befurt's recalculations) fall below accepted thresholds. *See* Ex. 1, Befurt Report, ¶ 36, Table 4 (net 28%).

REDACTED PURSUANT TO DKT. NO. 66

levels that courts have found to be evidence of secondary meaning.[7] *See* Ex. 1, Befurt Report, ¶¶ 37, 41.

It is axiomatic that selectively manipulating any data to arrive at a desired result is possible.  Indeed, simply adjusting the sample to arrive at different results appears to have been Befurt's assignment:

> **I didn't do an analysis of a secondary meaning survey**. In the end my assignment is to look at Mr. Sowers' survey, and I show, when I **adjust the sample**, how drastically the results differ and how drastically his net percentage that speaks to secondary meaning differs.

Ex. 3, Befurt Dep. at 202:1-6 (emphasis added).  Befurt fails to explain how the mere fact that his manipulated "net percentages" differ (even if drastically) from Sowers Survey percentages is in anyway evidence that the Sowers Survey is unreliable.  It is not.

### 3. Befurt Is Not Relying On His Adjusted Data In Support Of His Opinions That The Sowers Survey Sample Universe And Control Stimuli Are Improper.

Befurt is ***not*** relying on his adjusted data in support of his opinion that the Sower Survey sample universe and control stimuli are improper.  *See* Ex. 3, Befurt Dep. at 95:5-96:19.  Neither is he offering an opinion as to whether the Cafe Mark has acquired secondary meaning.  *See id*. at 58:12-24.  Befurt appears to be using the adjusted data as some sort of validation of his opinions regarding the sample universe and the control stimuli -- not as support for his opinions. *See id.* at 201:23–202:6. Specifically, he appears to apply the following methodology in his analysis:

- He opines that the survey sample is too broad and the control is unreliable;

---

[7] Consumer recognition above 50% has been held to be "sufficiently appreciable or significant to indicate secondary meaning." *President and Trustees of Colby College v. Colby College-New Hampshire*, 508 F.2d 804, 809 (1st Cir. 1975). Consumer recognition in the thirties can only be considered marginal and "[o]ften, consumer recognition below 25% fails to establish secondary meaning." *Yankee Spirits, Inc. v. Gasbarro*, No. 96-10967, 1998 WL 428092, at *9 (D. Mass. May 26, 1998) (Alexander, C.M.J.).

REDACTED PURSUANT TO DKT. NO. 66

- He then substantially limits the sample radius and removes the control to perform his alternative calculations;

- As a result, the net secondary meaning percentages increase;

- Ipso facto, his original opinions are correct.

Befurt's reasoning is circular and improper. *See Kumho Tire Co., Ltd. v. Carmichael*, 119 S. Ct. 1167, 1179 (1999); *see also McGovern*, 584 F. Supp. 2d at 424 (D. Mass. 2008) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (internal citations and quotations omitted).  He cites no authority in support of his method and analysis.

Yet, in his report, he claims that the data "***reveals***" that a "[l]arge proportion of Mr. Sowers' [restaurant and catering] respondents associate MILK STREET CAFE with restaurant and catering services of 'one particular company.'"  Ex. 1, Befurt Report, ¶¶ 37, 41 (emphasis added).  Allowing Befurt to testify to his unreliable, unverifiable adjusted data as any type of evidence of secondary meaning would be improper.

### 4.   Befurt's Adjusted Data Is Biased, Statistically Unreliable, And Irrelevant To The Present Matter

To arrive at his adjusted data, Befurt pulls out Sowers restaurant and catering respondents from the Sowers Survey within a 5 and 10 mile radius of the Cafe (as opposed to Sowers' 50 mile radius) .[8]  He then extrapolates that his data "**reveals**" that "a large proportion of Mr. Sowers' restaurant customer respondents associate 'Milk Street Cafe' with the restaurant and

---

[8] The geographic scope of the Sowers Survey relies directly on his fulsome review of the record, including the Cafe's testimony, its marketing, advertising and distribution channels and materials, statements made by Marc Epstein and Beth Epstein and the Cafe's written discovery responses. *See* Ex. 2, Sowers Report, at Appendix B. As such, the 50-mile and 5 mile radii are conservative as to where the past and prospective restaurant and corporate catering customers would be exposed to the Cafe Mark.

REDACTED PURSUANT TO DKT. NO. 66

catering services of 'One particular company.'"   Ex. 1, Befurt Report, ¶ 37.  Befurt's results are not statistically reliable.

Befurt's data relies on samples sizes significantly smaller than Sowers Survey.  The number of Sowers Survey Test Group respondents associating the Cafe with one particular company in the <u>restaurant</u> survey is 47 of 155 (based on a 50 mile radius of the Cafe and excluding the control group of 156 respondents).  Ex. 2, Sowers Report, ¶ 55. Befurt's are 14 out of 20 (five mile radius for restaurant), and 21 out of 39 (10 mile radius for restaurant). Ex. 1, Befurt Report, ¶ 36, Tables 3 and 4.  The number of Sowers Survey Test Group respondents associating the Cafe with one particular company in the <u>catering</u> survey is 79 of 160 (based on a 50 mile radius of the Cafe and excluding the control group of 81).  Ex. 2, Sowers Report, ¶ 58.  Befurt's are 17 out of 24 (5 mile radius for catering) and 22 out of 32 (10 mile radius for catering).  Ex. 1, Befurt Report, ¶ 38.

Sample sizes significantly higher than Befurt's have been rejected by courts as unreliable to establish secondary meaning.  *See e.g., Mastercard Intern. Inc. v First Nat. Bank of Omaha, Inc.*, No. 02-3691, No. 03-707, 2004 WL 326708 (S.D.N.Y. 2004) (survey excluded in jury trial because of, among other issues, small number of respondents:  "[T]he number of respondents surveyed is too small to provide meaningful results … . Only 52 respondents completed the survey, resulting in just 27 individuals reviewing the test cell materials and 25 individuals commenting on the control group materials.").  Befurt acknowledges that his samples sizes may not be statistically reliable.  Ex. 3, Befurt Dep. at 199:11-200:24.

Befurt did not conduct any test to validate his results.  *Id.* at 206:3-10.  He did not perform any confidence intervals.  *Id.* at 201:1-6.  And the purported "significance test" or "Chi Square" that Befurt refers to in his report is no more than a side-by-side comparison of the test

group percentage and the control group percentage.  Befurt admits that it is not a means to

validate his results.  *See Id.* at 206:3-6.  Nor is it relevant to the secondary meaning results and

conclusions.  *Id.* at 191:1-10, 201:16 - 202:6.

## CONCLUSION

**WHEREFORE**, for at least the reasons set forth above, CPK Media respectfully requests

that the Court grant its Motion to Exclude the Report and Testimony of Rene Befurt, Ph.D.


Dated: June 28, 2017                    Respectfully submitted,

                                        */s/ Dawn L. Rudenko*
                                        Scott T. Lashway (BBO #655268)
                                        Christopher M. Iaquinto (BBO #685718)
                                        Holland & Knight LLP
                                        10 Saint James Avenue
                                        Boston, Massachusetts 02116
                                        (617) 523-2700
                                        *scott.lashway@hklaw.com*
                                        *christopher.iaquinto@hklaw.com*

                                        Dawn L. Rudenko (BBO #637508)
                                        (*pro hac vice*)
                                        Holland & Knight LLP
                                        263 Tresser Boulevard, Suite 1400
                                        Stamford, Connecticut 06901
                                        (203) 905-4500
                                        *dawn.rudenko@hklaw.com*

---

**CERTIFICATE OF SERVICE**

I, Mackenzie A. Garrity, hereby certify that on June 28, 2017 this document and its accompanying documents filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and an unredacted copy of this document and the accompanying materials will be served by hand on June 29, 2017 upon counsel of record for Milk Street Cafe.

Dated: June 28, 2017                    */s/ Mackenzie A. Garrity*
                                        Mackenzie A. Garrity

---

**REDACTED PURSUANT TO DKT. NO. 66**