## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                      )
MILK STREET CAFE, INC.,                     )
                                                      )
            Plaintiff,                              )
                                                      )
            v.                                        )
                                                      )
CPK MEDIA, LLC, d/b/a                      )
MILK STREET KITCHEN,                      )
                                                      )
            Defendant.                            )
_____)    Civil Action No. 16-11416-DJC
                                                      )
CPK MEDIA, LLC,                               )
                                                      )
            Counterclaim-Plaintiff,          )
                                                      )
            v.                                        )
                                                      )
MILK STREET CAFE, INC.,                     )
                                                      )
            Counterclaim-Defendant.       )
_____)

## MEMORANDUM OF DECISION

**CASPER, J.**                                                           **August 9, 2017**

## I.      INTRODUCTION

        Last summer, shortly after Defendant CPK Media, LLC ("CPK") launched its new venture,

Milk Street Kitchen with well-known media personality Christopher Kimball ("Kimball") at its

helm, Plaintiff Milk Street Cafe, Inc. ("MSC"), a long-time café and catering operation founded

thirty-six years ago by successful entrepreneur Marc Epstein ("Epstein") and located on Milk

Street, filed this lawsuit.   MSC asserts a "reverse confusion" case against CPK, alleging that

1

CPK, although the newer of the two businesses, has and will cause MSC harm by infringing its trademark, otherwise undermining its goodwill and impeding MSC's market and potential future growth.    On July 29, 2016, this Court denied MSC's motion for preliminary injunction concluding that it had failed to show a reasonable likelihood of success on the merits.    D. 37.

On the eve of trial last month, MSC dropped its request for monetary damages, but proceeded to a bench trial still seeking permanent, injunctive relief enjoining CPK from any infringement of MSC's mark.    After a six-day bench trial begun on July 17, 2017 in which the Court heard testimony from the principals of both companies and competing expert testimony, the Court now concludes that MSC has failed to sustain its burden as to each of its claims:    trademark infringement in violation of 15 U.S.C. 1114(a) (Count I); trademark infringement, false association and unfair competition in violation of 15 U.S.C. 1125(a) (Count II); and violation of Mass. Gen. L. c. 93A (Court III).    CPK asserts a single counterclaim seeking a declaratory judgment that MSC's mark was improperly issued, has not achieved secondary meaning and is geographically descriptive, and that the mark should be canceled.    Accordingly, and for the reasons explained more fully below, the Court enters judgment as to all MSC's claims for CPK and, in light of this judgment, enters judgment for CPK on its counterclaim for declaratory judgment in part.    The Court now issues its findings of facts and conclusions of law regarding same below.[1]

---

[1] CPK had previously moved for summary judgment as to all of MSC's claims.   D. 90.   After hearing argument from counsel on the motion on July 11, 2017, D. 126, the Court indicated that, it was inclined to deny summary judgment, given the disputed issues of fact as to secondary meaning and reasonable likelihood of confusion for the trademark claims.   D. 152 at 29:4-31:17. Given the pendency of the bench trial, however, the Court reserved on resolution of the summary judgment motion.   D. 126.   Having further considered the matter, and having heard the evidence

## II.      FINDINGS OF FACT

### A.      <u>MSC</u>

1.      Opened in 1981 by founder and majority owner Epstein, MSC is located at 50 Milk Street and operates a café and corporate catering business.   1-31:1-9; 1-32:6-8; 1-159:11-13.[2]

2.      Although it has opened and closed other locations at various times since 1981, MSC operates only the 50 Milk Street location now and since the end of 2011.   1-160:1-2.

3.      From 1985-1990, MSC had a location in Kendall Square, Cambridge.   1-39:23-40:3.   From 1989-1993, MSC had a location in the Longwood Galleria in Boston.   1-40:4-9; 1-41:5-6.   From 1991-2007, MSC had a location in the park area at Post Office Square in Boston. 1-57:11-17.   From June to December 2011, MSC had its only location outside of Massachusetts, located on Wall Street in New York City.   1-52:2-5.   Since the end of 2011, however, MSC has had only one location, namely the location at 50 Milk Street.   1-160:1-2.

4.      The MSC café hours are from 7 a.m. to 3 p.m. on Monday to Friday with no weekend hours.   1-33:17-18.

5.      Although the MSC café at the 50 Milk Street location has been successful, Epstein noted that its corporate catering business is more profitable and MSC would not be in business without its corporate catering business.   1-166:19-167:1; 1-167:2-11; 1-168:8-10.

---

presented by both sides at the bench trial, and in light of the findings of fact and judgment on the merits as reflected here, the Court DENIES CPK's motion for summary judgment, D. 90.

[2] References to the transcripts of trial are abbreviated as "[day]-[page]:[line]."

6.      MSC's minimum for catering orders is $75-$100 and on average, a corporate catering order totals $330.   1-185:11-15; 1-186:11-13.

7.      MSC serves 15,000 customers per week, which includes café customers and people who eat the meals ordered through its corporate catering business.   1-168:15-17; 1-169:22-24.

8.      MSC's café services include a bakery, sushi station, hot entree stations and grab-and-go food options.   1-178:14-21.   The average restaurant bill is $8 to $13.   1-177:2-4.

9.      MSC's customers are café customers seeking prepared food for consumption and its corporate catering customers are people at businesses who order prepared food for catered meetings and events.   1-68:13-69:15.

10.     MSC's prospective café customers are those individuals who work, live or visit the downtown Boston area and its prospective catering customers are people at businesses who order food to be delivered.   2-55:15-56:21.

11.     The bulk of MSC's café customers work within five blocks of MSC's 50 Milk Street location; a smaller percentage of its café customers are kosher customers from the greater Boston area and kosher customers from around the world who visit Boston.   1-68:13-69:4.

12.     The sales territory for MSC's catering customers is wider than the bulk of its café customer base.   1-69:7-15.

13.     As of July 2016, MSC had approximately 15,000 corporate customers in its database.   2-71:9-11; Ex. 43.

14.     MSC receives approximately five to ten corporate catering orders per day from outside the I-495 beltway. 2-75:2-76:21; 3-30:21-31:2; Ex. 80.   Such orders could be placed from corporate headquarters from places outside of Massachusetts.   2-66:6-10.

15.     The vast majority of MSC's catering customers, however, place orders that are delivered to Boston and Cambridge with some deliveries as far out as the Route 128 belt.   2-66:2-6.

16.     Many of MSC's corporate catering deliveries are close enough to its Milk Street location that they are made by pushcarts or its fleet of delivery vans.   1-69:16-70:3.

17.     MSC markets its catering services primarily through its sales team.   3-19:2-6.

18.     MSC's corporate catering is a "personalized" business based upon relationships with its customers; approximately 90 percent of MSC's catering business is repeat business.   2-57:13-58:2; 2-78:17-19.

19.     Although MSC estimates that it spent approximately $2 million on advertising and marketing over a ten-year period, some of that budget included printing its logo on paper goods that it requires to do its business.   2-85:23-86:7; Ex. 105.

20.     Epstein created MSC to appeal to both kosher and non-kosher customers.   1-29:24-30:8; 31:1-9.

21.     Most of the MSC's customers do not know its food is kosher.   2-98:19-22; 1-46:3-11.

22.     MSC does "very little" to target kosher customers, 2-175:21-25, but its kosher customers learn about it through word-of-mouth, websites and/or lists that feature kosher restaurants.   1-72:25-73:12; 2-156:1-8; 2-175:21-176:10.

23.     As Beth Epstein, the long-time director of marketing for MSC and Epstein's wife, explained, MSC advertises and markets through elevator advertising in local offices, wrapping its fleet of vans with its logo, menus and flyers that are delivered to catering customers by hand and email and by printing its logo on paper goods such as coffee and paper cups.   2-186:23-187:6; see 2-94:5-23; 2-95:11-21; 2-89:16-23; Ex. 298.

24.     MSC does not use its website or social media as a primary channel to offer or promote its services.   3-21:20-22:12; 3-23:17-25.

25.     MSC has approximately 2000 friends on Facebook and approximately 400 followers on Twitter.   2-206:5-7; 2-206:15-17.

**B.     CPK**

26.     CPK is a media company founded by husband and wife, Christopher Kimball and Melissa Baldino.   5-78:24-79:21.   CPK has multiple platforms—website, cooking school, magazine, public radio show and a (soon to launch) public television show for teaching home cooks.  5-92:12-17; 5-118:7-9.

27.     CPK does not offer restaurant or catering services and has no plans to do so.   5-92:7-11.

28.     CPK is located in the historic Flour and Grain Exchange building at 177 Milk Street in Boston.   5-81:16-82:8; 5-83:11-84:1; 5-125:21-23; Ex. 337.

29.     Before picking the 177 Milk Street location, CPK scouted approximately sixty other locations.   3-95:9-20.

30.     Once it had settled on the location, CPK wanted a name that would refer to its location and would invoke its historic address.   3-111:13-112:21.

31.     By October 2015, Baldino was urging use of the Milk Street Kitchen name.   3-97:6-25; 3-112:22-113:13; 3-191:17-19; Ex. 18; Ex. 281.

32.     By December 23, 2015, CPK had finally settled on the Milk Street Kitchen name for its new venture.   3-98:5-7; Ex. 276.

33.     At 177 Milk Street, CPK houses its headquarters, records its television program and holds its cooking classes and other education panels and events.   3-95:21-24; 5-126:9-22.

34.     Although CPK is located on the same street, Milk Street, as MSC, unlike MSC, people cannot enter CPK's location without invitation.   5-190:10-15.

35.     Unlike MSC, CPK offers no prepared food for sale at 177 Milk Street.   5-190:8-9.

36.     CPK's prospective consumers are those interested in learning how to cook.   5-129:13-16; 5-130:4-5; 5-132:25-133:4.

37.     CPK uses public radio and television, as well as its social media platforms, namely Facebook, Instagram, Twitter, to distribute and promote its informational media content.   3-200:6-201:14; 5-117:2-15; 5-124:3-10; 5-130:7-14; 5-131:6-16; Exs. 182-184.

38.     CPK distributes its magazine online and in print.   5-129:1-9.

39.      CPK uses Facebook as the "major vehicle" to advertise its multimedia services.   5-117:8-15.   CPK currently spends approximately $60,000 to $70,000 per month on Facebook advertising.   5-134:17-24.   It has approximately 220,000 friends on Facebook.   3-200:8-9.

40.      CPK sells information content and cooking instruction.   5-129:1-134:10.

41.      CPK does not have on-site retail offerings and its headquarters at 177 Milk Street is not open to the public.   3-168:6-12; 5-127:23-25; 3-170:1-14; 5-127:23-128:12.

42.      CPK publishes a bi-monthly magazine that can be purchased through a yearly subscription or at a newsstand.   5-129:1-11; 3-158:18-159:2; Ex. 110.

43.      CPK's magazine already has 100,000 subscribers.   3-159:3-4.

44.      CPK will offer a cookbook for sale in September 2017.   5-136:13-21.

45.      CPK offers a public radio program, broadcast on 190-200 public radio stations nationwide and also available for download as a podcast.   3-174:1-7.   At least 120,000 people per month download this podcast, but that number is increasing.   3-174:8-15.

46.      CPK has already recorded a public television show that is scheduled to air in September 2017.   3-175:22-176:11.

47.      This television show will be available to 85-90% of the U.S. market.   3-176:10-11.

48.      CPK offers cooking education programs in its studio, where participants cook food themselves or attend cooking demonstrations.   3-160:1-16.

49.      CPK intends to sell certain hard-to-find ingredients through its website for recipes featured in its media content.   3-163:17-164:9.   These items will not be available for purchase at

177 Milk Street, 3-163:17-20; 5-164:3-6, and will not be branded "Christopher Kimball's Milk Street."   5-113:10-114:1.

50.     MSC and CPK are not competitors.   2-154:20-24.

**C.     <u>Trademark</u>**

51.     MSC owns a U.S. Registration for MILK STREET CAFE in class 43 for "restaurant and catering services" only. Reg. No. 4,021,933.   1-114:25-115:4; Ex. 4.

52.     Although MSC has been in business since 1981, it did not seek and receive the trademark registration until 2011.   1-153:8-14; Ex. 4.

53.     MSC seeks to enforce its trademark against "Christopher Kimball's Milk Street" nationally.   1-170:20-22.

54.     CPK's "Christopher Kimball's Milk Street" logo is comprised of three tiered elements: a stylized bowtie, and the words "Christopher Kimball's" above "Milk Street" with different text sizes and sans serif fonts.   5-116:6-10; Exs. 110-111; 167; 182-184.

55.     Baldino came up with the idea to use "Milk Street" as part of the new business name in October 2015.   5-87:12-16.

56.     CPK first learned of MSC's trademark for restaurant and catering services in or about early November 2015 through a preliminary trademark search.   5-91:25-92:3; Ex. 27.

57.     Kimball, but not Baldino, learned of MSC's trademark during the trademark search at or about that time.   3-126:24-127:5; 3-128:6-7; 3-194:6-25

58.     Kimball did not know MSC, but assumed from the name that it was a restaurant located in Boston.   3-130:1-131:1.

59.     CPK finalized its decision to use Milk Street as part of its original launch name of "Milk Street Kitchen" and then, in December 2015, submitted a trademark application for that mark and Christopher Kimball's Milk Street Kitchen.   3-149:16-150:2; Exs. 112, 122, 175.

60.     Although CPK launched on June 1, 2016 as Milk Street Kitchen, given the dispute underlying this case, CPK dropped use of "Kitchen" in September 2016 and the enterprise is now known as "Christopher Kimball's Milk Street."   2-37:20-23; 3-171:4-172:5; Exs. 278-279.

61.     CPK will not use "Kitchen" in its name going forward.   5-98:16-18.

62.     The MSC logo consists of the term "Milk Street Cafe," a green brush stroke underneath, and a floral "Monet-esque" painting. 1-172:17-173:22; 2-192:24-193:13.

63.     Both MSC and CPK have, at times, used "Milk Street" as shorthand for their respective businesses.   1-94:7-11; 1-94:14-19; Ex. 249-51, 253 (MSC's "Milk Street News"); 3-106:14-107:2; 3-107:3-18; Ex. 216.   Such shorthand was with a context or materials which already identified the full name of each entity, either Milk Street Café or Christopher Kimball's Milk Street.   Id.

64.     Although MSC owns the domain milkstreet.com, it does not publicly use this domain name; instead it uses milkstreetcafe.com for public communications and its staff e-mail addresses.   1-112:22-25.   All inquiries to milkstreet.com are routed to milkstreetcafe.com.   1-113:18-114:1.

65.     MSC does not own a trademark for "Milk Street."   1-171:18-20.

66.     On February 5, 2016, the USPTO issued a preliminary office action denying CPK's trademark applications (for "Milk Street Kitchen" and "Christopher Kimball's Milk Street")

finding the marks geographically descriptive; the USPTO found no likelihood of confusion with any other mark.   5-99:6-101:11; Exs. 116, 126.

67.    Based on the grounds for the PTO's action, CPK did not believe anyone could obtain a trademark for the name "Milk Street."   5-101:18-22.   In June 2016, Kimball reiterated this belief during a meeting with Epstein stating that MSC "had no right to the name of the street, that the street was a public domain."   1-121:21-23; 2-45:20-46:3; 5-106:15-21.

68.    The USPTO published three CPK applications that include "Milk Street" in the marks; none were refused based on the MSC trademark.   3-155:21-156:19; 5-114:22-115:13; 5-114:7-18; Exs. 147, 161, 175.

### D.    <u>Secondary Meaning</u>

69.    CPK offered the only consumer survey in this case, conducted by Brian Sowers ("Sowers Survey"), concerning whether the MSC trademark has acquired secondary meaning. 5- 215:20-23.

70.    The Sowers Survey tested whether the MSC trademark had acquired secondary meaning for café customers and for corporate catering customers.   5-215:20-23.

71.    Survey respondents qualified as past or potential café customers if they lived within fifty miles of MSC or worked within five miles of MSC and indicated that they had eaten at a fast casual restaurant in the past six months or plan to eat at one in the next six months.   5-228:15-19; 5-230:5-9.

72.     Survey respondents qualified as past or potential corporate catering customers if they worked within fifty miles of MSC and had at least some responsibility for the hiring, ordering or choosing catering services at their place of employment.   5-229:11-21.

73.     Of the respondents, the test group was asked about the phrase "Milk Street Café"; the control group was asked about the phrase "Main Street Café."   6-13:22-25.

74.     The key question that each group was asked was whether you associate Milk Street Café (for the test group) or Main Street Café (for the control group) with one particular company; more than one company; no particular company; or "don't know/unsure."   6-13:7-13.

75.     Based upon the test group respondents and the control respondents for the café customers, Sowers concluded that the secondary meaning for the MSC trademark for café customers was 9.2%.   6-25:7-9; 6-26:22-24.

76.     Based upon the test group respondents and the control group respondents for the corporate catering customers, Sowers concluded that the secondary meaning for the MSC trademark for corporate catering customers was 17.4%.   6-25:7-9; 6-26:22-24.

77.     As Sowers thoroughly and credibly explained, he reached these percentages by subtracting the percentage of control group respondents who identified "Main Street Café" (a generic name used by numerous restaurants including some in Massachusetts, 6-58:17-6-59:25) with one particular company from the percentage of test group respondents who identified "Milk Street Café" with one particular company.   6-25:7-19; 6-26:25-27:6.

78.     Such calculation eliminates any "noise" from test group responses; that is, the control group responses served as a proxy for the likely percentage of "guessing," assuming or misunderstanding reflected in the test group responses.   See 6-58:17-6-59:25.

79.     In designing the geographic survey, Sowers relied upon a fulsome record, with a primary emphasis on where prospective restaurant and catering consumers would be exposed to the MSC mark based on marketing, advertising, media coverage or other means.   6-9:6-20.

80.     MSC challenged the reliability of the Sowers Survey with its expert, Dr. Rene Befurt ("Befurt") on two grounds:   namely, the geographic scope of the survey and the use of "Main Street Cafe" as a control.   4-140:13-141:4; 4-153:18-154:8; 4-158:14-159:11.

81.     Befurt, however, did not offer an opinion about whether the MSC trademark has acquired secondary meaning.   5-6:8-13.

82.     Unlike Sowers, Befurt reviewed and considered a much more limited number of case-related documents (primarily the complaint, Sowers report and Epstein deposition).   5-11:22-12:1.

83.     Befurt's opinion that the geographic scope of the Sowers survey was too broad was based largely on excerpts from Epstein's deposition about where the majority of restaurant customers work and where the majority of corporate catering orders are delivered.   5-27:18-30:7.

84.     Such scope, however, does not reflect an appropriate geographic scope of where past and potential café and corporate catering customers were and could be exposed to the MSC trademark.

85.     This is particularly true where testimony from Epstein and other evidence proffered at trial reflected local, regional and some national media coverage of MSC.   See, e.g., 1-50:7-14; 1-82:4-13; 1-85:20-86:25; 2-33:1-5; Exs. 236, 299

86.     For example, MSC relied upon media coverage in the New York Times, Wall Street Journal, Boston Globe, Washington Post, USA Today and the Boston Business Journal in seeking to enforce its trademark, and for contending that its "impeccable reputation that extends well beyond the Boston area."   2-42:2-6; Exs. 35, 179.

87.     Through this media coverage, MSC claims that people have been exposed to its trademark nationwide.   2-60:10-61:18; 2-39:8-40:25; Exs. 35, 41.

88.     Over time, MSC has also sought to enforce its trademark in a wider geographic scope, specifically, against third-parties in New Jersey and Nantucket.   1-115:21-116-4; 2-27:7-10; 2-30:19-34:13; Ex. 179.

89.     MSC also relied upon testimony from another expert, Dr. Christopher Muller ("Muller"), in support of its claim that MSC has acquired secondary meaning.   4-20:25-21:2.

90.     Muller opined, with little evidentiary support (no consumer survey or other indicators of consumer understanding other than media accounts of MSC and self-generated advertising by MSC) and inadequate explanation of his methodology that MSC had acquired secondary meaning and that it had likely done so by the 1990s, but certainly before December 2010.   4-21:18-21; 4-87:24-88:1.

91.     Even assuming that Muller was qualified to offer such opinion as to secondary meaning under Fed. R. Evid. 702 (or, alternatively, even if it could be considered lay opinion under FRE 701), the Court gives this opinion little weight.

92.     Muller's testimony that MSC is a "destination restaurant," and its enterprise reaches "[a]cross the entire state of Massachusetts," 4-25:13-20; 4-99:20-100:4, even if credited, does not show that MSC has acquired secondary meaning.

93.     Moreover, it also cannot be said that "Milk Street" alone has acquired secondary meaning for MSC.   There is no evidence that the public commonly refers to MSC as "Milk Street."   MSC does not refer to itself simply as "Milk Street," without first identifying itself as Milk Street Cafe.   See 2-190:23-195:8; Exs. 249-251, 253.   It stopped distributing its Milk Street News in 1995 and no longer promotes its Milk Street Money.   2-194:5-7; 3-37:4-5.

94.     MSC does not publicly use milkstreet.com in association with its business or trademark.   2-101:25-102:4.   MSC had all emails sent to @milkstreet.com to Epstein's email account.   2-103:5-15.

E.     **Reasonable Likelihood of Confusion**

95.     There is no evidence that the senders of @milkstreet.com emails are past or prospective MSC consumers.   None of these emails sought MSC or restaurant or catering services.   2-112:10-13; 2-113:19-21; 2-115:2-6; 2-117:9-21; 2-119:9-11; 2-120:3-15; 2-122:5-123:18; 2-126:3-19; 2-127:17-24; 2-128:23-129:7; 2-130:10-16; 2-132:6-23; 2-133:8-20; 2-

134:16-135:8; Exs. 307-323. Also, of the emails that include geographic information, all but one are from outside Massachusetts.   Ex. 308; Ex. 310-311; Exs. 315-16; Ex. 319; Exs. 321-22.[3]

96.     Epstein testified that it is possible that the senders of these emails were mistaken or sent the emails to the wrong address.   2-114:1-135:8.   No misdirected emails were sent to @milkstreetcafe.com.   2-143:10-17.

97.     MSC introduced submissions that it received through its "Contact Us" website page.   There is no evidence that the senders of these submissions are past or prospective MSC customers or were seeking restaurant or catering goods or services.   3-44:18-57:22; Exs. 327-335. Eight of them identify addresses outside of Massachusetts.   3-68:15-17; 3-69:3-5; 3-72:24-25; 3-76:23-77:15; 3-79:6-8; 3-84:1-3; Exs. 327-333, 335.

98.     MSC offered two alleged instances where an unknown person inquired about the parties, both occurring within three weeks of the launch of Milk Street Kitchen, with no mention of Milk Street Kitchen or Christopher Kimball in one, and explicit acknowledgment of there being "two companies" in the other.   3-4:12-6:2; 3-177:19-178:15; Exs. 40, 336.

---

[3] As this decision suggests, the Court concludes that these emails are not from the correct universe of potential customers (i.e., past or potential customers of MSC), given the reverse confusion theory underlying MSC's claims.   The Court conditionally admitted these exhibits as exceptions to hearsay (since they were not offered for truth but for the state of mind of consumers), 1-4:19-5:10, but reserved admission on the issue of relevance, because it was not clear that customers seeking services from CPK were relevant to MSC's claims.   D. 153 at 22:22-23:12; 1-127:2-6. However, even assuming that they represented the relevant universe of consumers, as discussed below, such a small number of incidents constitutes, at most, *de minimis* examples of confusion.

99.     Muller opined that there is a likelihood of confusion between MSC's mark and CPK's proposed marks.   4-21:22-25.   MSC's reliance upon Muller's opinion as to reasonable likelihood of confusion does little to aid its claims.

100.     As CPK's rebuttal expert, Robert L. Klein, noted and the Court credits, Muller does not sufficiently explain his methodology or provide sufficient factual basis for his opinion that there is a likelihood of confusion between the MSC and CPK trademarks or that such likelihood has the potential to cause significant harm to MSC.   6-99:4-8.

101.     Muller offered no consumer survey evidence or other empirical data and did not sufficiently explain his methodology.

102.     To the extent that Muller relies, in part, on the less than twenty examples of alleged actual confusion, such examples, even assuming that they represent the relevant customer universe, are *de minimis* when measured against MSC's weekly 15,000 customers.

103.     Muller's opinion did not adequately consider all of the relevant evidence as it bears upon the other relevant factors for determining likelihood of confusion, other than actual confusion and the strength of MSC's mark, including similarity of the marks, similarity of goods, the parties' channels of trade and advertising, the parties' prospective customer bases and CPK's intent in adopting its mark.

104.     Even assuming that Muller was qualified to offer such opinion as to reasonable likelihood of confusion under Fed. R. Evid. 702 (or, alternatively, even if it could be considered lay opinion under FRE 701), the Court gives this opinion little weight.

105.    There is no evidence of non-speculative harm to the MSC's trademark, its goodwill, reputation, or otherwise.   1-122:18-123:5; 1-143:24-144:16; 3-16:7-16.

106.    MSC cannot point to any café or corporate catering business that it has lost as result of actions by CPK.   2-54:19-24.

## III.    CONCLUSIONS OF LAW

MSC asserts three claims against CPK, but all of those claims rise or fall upon the trademark claims, Counts I and II, which the Court addresses first below.

### A.    <u>Count I – Infringement of Federal Trademark, 15 U.S.C. § 1114(a)</u>

To prevail on an infringement of trademark claim, MSC "must demonstrate both that its mark merits protection and that the allegedly infringing use is likely to result in consumer confusion."   <u>Borinquen Biscuit Corp. v. M.V. Trading Corp.</u>, 443 F.3d 112, 116 (1st Cir. 2006).

### 1.    **Secondary Meaning**

For a descriptive trademark such as MSC's mark to merit protection, it must "exhibit[] acquired distinctiveness gained through secondary meaning."   <u>Boston Duck Tours, LP v. Super Duck Tours, LLC</u>, 531 F.3d 1, 13 (1st Cir. 2008) (citing <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 769 (1992)).   By taking on a secondary meaning, MSC's geographically descriptive mark "no longer causes the public to associate the goods with a particular place, but to associate the goods with a particular source."   <u>Boston Beer Co. Ltd. P'ship v. Slesar Bros. Brewing Co.</u>, 9 F.3d 175,181 (1st Cir. 1993) (citation omitted).

When a party seeks protection of a registered trademark, as MSC does here, then such registration is "prima facie evidence of the validity of the registered trademark," <u>Bourinquen</u>

Biscuit Corp., 443 F.3d at 117 (quoting 15 U.S.C. 1115(a)), i.e. that the descriptive mark has acquired secondary meaning.   Id.   The alleged infringer, here, CPK, however, may rebut this presumption and show that the mark is merely descriptive and has not acquired secondary meaning.   Id. at 117-18.   If CPK has done so, then the burden shifts back to MSC "to assume the devoir of persuasion on the issue of whether its mark has acquired secondary meaning."   Id. at 118.

After the full record developed at trial, the Court rules that CPK has rebutted the presumption of validity, by showing that the MSC trademark is merely descriptive and has not acquired secondary meaning and MSC has failed to show otherwise in response.

When determining whether a mark has achieved secondary meaning, the Court looks to "the mindset of [] likely consumers and not simply" the strength of the business' record or achievements in the abstract.   Flynn v. AK Peters, Ltd., 377 F.3d 13, 21 (1st Cir. 2004).   MSC has heavily relied upon MSC's years in the marketplace (approximately 36 years), its standing as a highly ranked caterer in Massachusetts (by the Boston Business Journal over consecutive years) and its media coverage over time as having a café that is a local destination for non-kosher and kosher customers seeking breakfast or lunch.   However, "[d]irect evidence, such as customer surveys or testimony, although not required, is considered highly probative" as to whether a mark has acquired secondary meaning, Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab., Inc., 997 F. Supp. 2d 92, 103 (D. Mass. 2014) (citing Bay State Sav. Bank v. Baystate Fin. Servs., LLC, 484 F. Supp. 2d 205, 214 (D. Mass. 2007)), and such evidence was only offered by CPK to show, credibly, that the MSC mark has not acquired secondary meaning either among potential café

19

customers or corporate catering customers.    The Sowers Survey was designed to query a relevant

universe of potential customers—not merely those who have been customers, but could be

potential customers of MSC.    A radius of fifty miles away from MSC's Milk Street is a

reasonably drawn universe for such survey, particularly given the testimony of Epstein regarding

the local, and sometimes national, media coverage of MSC's current and past locations (including

multiple locations in Massachusetts and one in New York City).    Although perhaps the Sowers

Survey could have been designed to test a differently drawn universe, the universe it did survey

was reasonably drawn given the other evidence in the record.    Moreover, given the survey

conclusions that MSC mark had secondary meaning only for 9.2% of the potential café customers

and 17.4% of the potential corporate catering customers, this Court does not conclude that this

evidence, representing small percentages of potential customers, amounts to a showing that the

MSC mark acquired secondary meaning.[4]

Even considering circumstantial evidence as to secondary meaning, MSC's claim does not

fare any better.    Courts may consider a number of factors to determine whether circumstantial

evidence supports a finding of secondary meaning:    "(1) the length or exclusivity of use of a

---

[4] To support a finding of secondary meaning, a 50% rate of identification of the mark is considered
to be "sufficiently appreciable or significant to indicate secondary meaning."    President &
Trustees of Colby Coll. v. Colby Coll.-New Hampshire, 508 F.2d 804, 809 (1st Cir. 1975).    While
lesser percentages have been found to be appreciable or significant, see, e.g., Zippo Mfg. Co. v.
Rogers Imports, Inc., 216 F. Supp. 670, 687 (S.D.N.Y. 1963) (42.6%), or at least to raise a question
of fact that could be resolved by other circumstantial evidence, see, e.g., Boston Beer, 9 F.3d at
183-183, n.5 (36%); Mark Bric Display Corp. v. Joseph Struhl Co., Inc., No. 98-cv-532ML, 2003
WL 21606318, at *9 (D.R.I. July 9, 2003) (30%), generally "consumer recognition below 25%
fails to establish secondary meaning."    Yankee Spirits, Inc. v. Gasbarro, No. 96-cv-10967-PBS,
1998 WL 428092, at *9 (D. Mass. May 26, 1998) (collecting cases).

mark; (2) the size or prominence of plaintiff's enterprise; (3) the existence of substantial advertising by plaintiff; (4) the product's established place in the market; and (5) proof of intentional copying." <u>Bay State Sav. Bank</u>, 484 F. Supp. 2d at 214 (citing <u>I.P. Lund Trading v. Kohler Co.</u>, 163 F.3d 27, 42 (1st Cir.1998)).   As to the first consideration, the length of use of the mark, without more, is insufficient to show secondary meaning.   <u>Lyons</u>, 997 F. Supp. 2d at 104-05.   Accordingly, the fact that MSC's mark has been in use since 1981 (but only protected by a registered trademark since 2011) does not carry the day.   As to the second factor, there is no dispute by the parties that Epstein has run a successful business since 1981, even as MSC has had to close all but its Milk Street location over time.   That being said, the crux of its enterprise is in Massachusetts, not on a national stage where it seeks to enforce its mark against CPK, a media company with a growing presence nationally.   As to advertising, MSC's advertising cannot be described as substantial, either in the abstract or by comparison to CPK's.   By the testimony of the Epsteins, the bulk of their advertising has been in the form of local advertising (sides of delivery vans and on its paper goods; elevator advertising; listing on kosher websites) and much of their corporate catering, the more profitable arm of their business, is repeat business.   As to MSC's place in the marketplace, it is firmly in the restaurant and catering space in Massachusetts, but in no other space.   That is, it occupies a space distinctive from the services of CPK, which, as discussed below, is not offering the same services and has no intention to do so.

Finally, there has been no showing, by direct or circumstantial evidence, that CPK or anyone affiliated with CPK intentionally copied MSC's mark.   First, the marks are similar only in reference to "Milk Street," the location of both businesses.   CPK's mark draws off the renown

of its co-founder, both in the use of his name, "Christopher Kimball's" and the symbol of his trademark bowtie.   MSC's mark, which has changed over time to its current Impressionist painting, has at its core, the name of Milk Street Café, but shares no other characteristics with that of CPK.   Moreover, the Court credits that CPK landed on its Milk Street name after finding its location at 177 Milk Street, not as the result of knowing about MSC and its trademark or seeking to gain any advantage from such association.   That at some point Kimball learned of MSC's trademark before finalizing the CPK mark in December 2015 does not show intentional copying or evidence of willfulness of same, particularly where MSC's trademark is for restaurant and catering services, which does not share the media space that CPK has now begun to occupy.

For all of these reasons, the Court concludes that there has been no showing that MSC has acquired secondary meaning.

### 2.    Likelihood of Confusion

Even assuming *arguendo* that MSC had shown, as an initial matter, that its mark should be protected, it has also failed to show that CPK's allegedly infringing use will likely lead to consumer confusion.   Riverbank, Inc. v. River Bank, 625 F. Supp. 2d 65, 76 (D. Mass. 2009).   Substantial likelihood of confusion is analyzed by balancing consideration of a number of factors:   "1) the similarity of the marks; 2) the similarity of the goods; 3) the relationship between the parties' channels of trade; 4) the relationship between the parties' advertising; 5) the classes of prospective purchasers; 6) evidence of actual confusion; 7) the defendant's intent in adopting its mark; and 8) the strength of the plaintiff's marks."   Riverbank, 625 F. Supp. 2d at 70 (citing Astra Pharm. Prods. v. Beckman Instruments, Inc., 718 F.2d 1201, 1205 (1st Cir. 1983)).   Considering the

balance of these factors, MSC has also failed to show a likelihood of consumer confusion.

As discussed above, the parties' marks are similar only as to reference to the actual location of both businesses, "Milk Street."   As MSC recognized at trial, it has no trademark protection in "Milk Street," nor could it reasonably be suggested that it could be given the nature of the phrase, as suggested by the PTO, was "primarily geographically descriptive of the origin of applicant's goods and/or services."   Ex. 116 at 3; 5-99:6-101:11; see Ex. 126.   Although the duration of MSC's mark (in use since 1981) is a factor in its favor in the analysis of the relative strength of the parties' mark, the dissimilarity between the two marks detracts from the weight as to the duration of MSC's mark.

The goods and services offered by the respective parties are not similar.   MSC offers prepared food for patrons seeking breakfast and lunch on Mondays-Fridays between 7 a.m. and 3 p.m. in the financial district and corporate catering to businesses essentially within driving distance of MSC (for its delivery van fleet).   By contrast, most of CPK's customers--namely radio listeners, television watchers or magazine/website subscribers--never have to set foot on or near Milk Street to take advantage of its offerings.   Even those customers who travel to the CPK's Milk Street for pre-scheduled cooking demonstrations or panel discussions cannot get restaurant or catering services because CPK does not offer any.    That CPK has a plan to offer "hard-to-find" ingredients on its website does not move it closer to MSC's channel of trade where this is a far cry from offering prepared food for sale which customers can buy on Milk Street from MSC.

Both the parties' channels of trade and advertising bear little in common.   MSC has succeeded for thirty-six years by offering kosher prepared food to a range of non-kosher and kosher

clientele in the Boston area and its means and budget for advertising reflects a local focus without a significant social media presence.   CPK has a significant and growing social media presence which aligns with its mission (of teaching home cooks to cook) and the national reach of its radio show, magazine and soon-to-launch television show.    That is, there is not much overlap between the parties' potential customers:   for MSC, on-foot diners in the financial district and business contacts seeking catering for business events in the greater Boston area; for CPK, home cooks looking for radio, TV, magazine/website or in-person instruction.

At trial, MSC spent a lot of time introducing evidence of what it deemed incidents of "actual confusion" by CPK's allegedly infringing use.   Its claim against CPK is a "reverse confusion" case in which MSC, "the senior user[,] objects to the junior user's use of a mark that will cause consumers to associate the senior user's goods or services with the junior user," Riverbank, 625 F. Supp. 2d at 65 (citation omitted), because prospective or actual customers of the senior user "consider [it] the unauthorized infringer" or the junior user "injure[s] [the senior user's] reputation and impair[s] its goodwill."    Visible Sys. Corp. v. Unisys Corp., 551 F.3d 65, 72 (1st Cir. 2008) (quoting 4 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 23:10, at 23–47 (4th Ed. 2006)).    That is, the relevant consumer population who must be confused are MSC's customers or potential customers, not CPK's.    Yet, the great majority of incidents of alleged actual confusion were by consumers seeking to connect with CPK for its services and not with MSC.   The instances in which the individuals could be fairly characterized as MSC's customers were not actually confused by the entities, but expressed concern that CPK's name could be confused with MSC.   Even assuming that all of the alleged instances of actual confusion

proffered by MSC represent the relevant universe for a reverse confusion case, they still, at most, amount *de minimis* confusion, particularly when considered in the context of the 15,000 customers that MSC serves each week and the fact that there was no evidence that MSC has lost any business as a result of CPK's allegedly infringing use.   Although the Court is well aware that a plaintiff need not show actual confusion to carry its burden on a trademark claim, the absence of any relevant, meaningful showing of actual confusion, particularly in connection with the dearth of showing as to the other factors in MSC's favor, supports the Court's ultimate finding that MSC has not shown a likelihood of consumer confusion.

Finally, CPK's intent in adopting its mark does not weigh in favor of finding a likelihood of consumer confusion.   As suggested above, on this full developed record, the Court does not find any willful or other intent to copy or capitalize on MSC's mark in CPK's adoption of its mark. The Court credits Kimball and Baldino's testimony about the evolution of the Milk Street Kitchen name and the reasons for same, the dropping of "Kitchen" from its name as the current dispute proceeded and no plan to resume using "Kitchen."   Kimball's position with Epstein during their June 10, 2016 meeting as to MSC not being able to protect "Milk Street" is the same as Kimball described CPK's understanding of the limits of MSC's trademark for restaurant and catering services when it arose in the earlier trademark search and the same as it was during this litigation.

For all of these reasons, MSC has also failed to show a likelihood of consumer confusion. Having been unable to show essential elements of its claim, MSC's claim for trademark infringement under Count I fails.

### B.      Count II – Trademark Infringement, False Association and Unfair Competition, 15 U.S.C. § 1125(a)

MSC's claim for trademark infringement, false association and unfair competition under Count II also fails.    To prevail on a false association claim, a party must prove that "(1) [d]efendant[ ] used a designation (any word, term, name, device, or any combination thereof); (2) the use was in interstate commerce; (3) the use was in connection with goods or services; (4) the designation or false designation is likely to cause confusion, mistake, or deception as to (a) the affiliation, connection, or association of defendant with another person, or (b) as to the origin, sponsorship, or approval of defendant's goods, services, or commercial activities by another person; and (5) plaintiff[s] ha[ve] been or [are] likely to be damaged by these acts."    Brown v. Armstrong, 957 F. Supp. 1293, 1300 (D. Mass. 1997) (citation omitted), aff'd, 129 F.3d 1252 (1st Cir. 1997).

This Court will not repeat all of its analysis as to Count I, but incorporates it by reference as to Count II.    As with Count I, MSC's trademark claim under Count II fails as well, particularly where MSC has failed to show a likelihood of confusion, an essential element as to Count II as well.    Moreover, MSC has failed to show that it has been damaged or injured by CPK's allegedly infringing acts.    Even where MSC proceeded to trial only seeking injunctive relief (having dropped its claim for damages), it still must show injury as to Count II and also to be entitled to the permanent injunctive relief that it seeks.    No such injury has been shown here.    Epstein testified that his business continues to be strong and even the incidents of alleged actual confusion proffered at trial do not suggest any lost or diverted sales from MSC.    There was fleeting reference to "administrative costs" to MSC for having to deal with any confusion with CPK, but

26

there was no attempt to quantify such costs and nothing in the record to suggest such costs, even if proven or quantified, would amount to sustained injury that merits the breadth of injunctive relief that MSC seeks.

For these reasons, MSC also does not prevail on Count II.

**C.**     **Count III – Violation of Mass. Gen. L. c. 93A**

MSC's last claim, Count III asserts a Chapter 93A claim against CPK, an entity engaged in trade or commerce, for allegedly unfair methods of competition or unfair or deceptive acts or practices.   Mass. Gen. L. c. 93A, § 11.   "The standard for trademark infringement under Mass. Gen. L. c. 93A § 11 and 110H § 12, and the common law of trademark infringement is essentially the same as that under the Lanham Act."   Boston Granite Exch., Inc. v. Greater Boston Granite, LLC, No. 11-CV-11898-JLT, 2012 WL 3776449, at *5 (D. Mass. Aug. 29, 2012).   That is, as MSC acknowledged, Count III, the Chapter 93A claim, rises and falls with its trademark infringement claims under Counts I and II.   Having not prevailed on Counts I and II, the Chapter 93A claim fails as well.   While a claimant may additionally prove that "the act or practice was a willful or knowing violation," subjecting a defendant to between double and triple damages, Mass. Gen. L. c. 93A, § 11, MSC abandoned any claim for damages and, as noted above, the Court finds no willful intent by CPK as to infringement (or here, as to any alleged violation of Chapter 93A). For all of these reasons, MSC's Chapter 93A claim also fails.

For the aforementioned reasons, the Court shall enter judgment for CPK as to each of MSC's claims against it, namely Counts I, II and III.

### D.      **CPK's Counterclaim – Declaratory Judgment**

To the extent that CPK's counterclaim seeks declaratory judgment that the MSC trademark is merely descriptive and has not achieved secondary meaning and that CPK has not infringed that mark, the Court grants judgment to CPK on its counterclaim as to these findings as they have been necessarily made by this Court on the record at trial.   To the extent that CPK further seeks a declaration that the MSC trademark was improperly issued in 2011 and should now be cancelled, D. 44 at 17, the Court declines to do so.   While "the district court has concurrent power [with the PTO] to order cancellation" of a mark, Ditri v. Coldwell Banker Residential Affiliates, Inc., 954 F.2d 869, 873 (3d Cir. 1992), and district courts considering infringement claims may "resolve a companion validity claim at the same time, if the issues underlying the two claims overlap to an extent that makes this course sensible," PHC, Inc. v. Pioneer Healthcare, Inc., 75 F.3d 75, 81 (1st Cir. 1996), a claim to cancel the registration of a mark must state the party's belief "that he is or will be damaged" by the continued registration of the challenged mark, 15 U.S.C. § 1064.   What injury CPK would suffer by the continuation of MSC's mark is not reflected in the record to date and the Court, accordingly, does not grant this element of the declaratory relief that CPK seeks. See East Iowa Plastics, Inc. v. PI, Inc., 832 F.3d 899, 904 (8th Cir. 2016); see also Lyons, 997 F. Supp. 2d at 117.

## IV.     **CONCLUSION**

In light of these findings of fact and conclusions of law, the Court enters judgment for CPK on MSC's claims, Count I, II and II.    In light of this judgment, the Court enters judgment for CPK on its counterclaim for declaratory judgment only to the extent noted above.

**So Ordered.**

/s/ Denise J. Casper
Denise J. Casper
United States District Judge